UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-81008-CIV-MARRA

MARTIN MIKHAIL,

Plaintiff,

vs.

CITY OF LAKE WORTH; WILLIAM SMITH,
in his official capacity as Chief of Police of the
City of Lake Worth; STEVEN VENETUCCI,
individually and in his official capacity as Police
Sergeant; and ROBERT RASHKIN, individually
and in his official capacity as a police officer,

Defendants.
_____/

**OPINION AND ORDER**

This cause is before the Court upon Plaintiff Martin Mikhail's Motion for Preliminary Injunction (DE 2). The Court held a hearing on the motion. Having considered the motion, the evidence filed with the Court, argument of counsel, testimony of witnesses and being otherwise fully advised in the premises, the Court finds it appropriate to deny the Motion for Preliminary Injunction. The Court makes the following findings of fact and conclusions of law in connection with the denial of the preliminary injunction.

I. Findings of Fact

On September 8, 2007, Plaintiff Michael Mikhail went to downtown Lake Worth, Florida with the purpose of "preach[ing] the gospel of Jesus Christ." Mr. Mikhail stood on the edge of a sidewalk, near a restaurant bar called Brogue's. It was a busy Saturday night, around 10:00 p.m., with lots of people milling about at the various restaurants and bars in downtown Lake Worth.

Prior to speaking, Mr. Mikhail approached Police Officer Robert Raskin and informed him that he would be preaching. Officer Raskin told him that he had a right to do that. After a little while, Mr. Mikhail became loud and several people approached Officer Raskin to complain that Mr. Mikhail was calling them sinners. Officer Raskin responded by telling Mr. Mikhail not to disturb people and to do what he said he was going to do; that is, quote Scripture. Officer Raskin then left and proceeded about two blocks away. Next, several girls came running up to Officer Raskin, imploring him to return to Brogue's. These women stated that one of their boyfriends was going to "kill" Mr. Mikhail and that he was yelling at people and calling them names. When Officer Raskin arrived, he heard Mr. Mikhail pointing at specific people, loudly calling people "sinners,""whores" and "prostitutes." A crowd of about thirty to forty people had gathered around Mr. Mikhail. Officer Raskin then observed one of the men getting up from the table where Mr. Mikhail was directing his speech. Believing that Mr. Mikhail was about to be attacked, Officer Raskin approached Mr. Mikhail, informed him that he was causing a disturbance, referenced Florida Statute § 877.03, and asked him to stop.[1] Mr. Mikhail started quoting Scripture to him. Officer Raskin then said, "Look, you're preaching to the wrong guy. I'm a Jew. As far as I'm concerned, that's a book of fiction." Mr. Mikhail continued talking for a few minutes and then walked away.

Officer Raskin never told Mr. Mikhail that he needed a permit to preach. Sergeant Joseph Venetucci has no recollection of speaking with Mr. Mikhail over the telephone about needing a permit to preach. However, Sergeant Venetucci testified that the permit ordinance would not

---

[1] Officer Raskin also testified that if someone in the crowd was "offended" by Mr. Mikhail, he could arrest him as long as the conduct also rose to the "level of being disorderly."

apply to street preachers.  Likewise, Mr. Karns, the city of attorney for Lake Worth, testified that the permit ordinance does not apply to street preachers.  It is designed to be used for parades, block parties or special events.

The next incident took place on or about July of 2008. Deputy Timothy Rebholz was driving through downtown Lake Worth when he heard a disturbance.  He went to investigate and came upon the manager of a restaurant ordering Mr. Mikhail to leave his property and Mr. Mikhail stating that he had a right to preach on the sidewalk.  Mr. Mikhail was standing in between the entranceway to the restaurant and a table. Deputy Rebholz explained to Mr. Mikhail that the restaurant owned part of the sidewalk for its outdoor café and told him to back up onto the public sidewalk.  Mr. Mikhail responded by yelling "whore" at a waitress working at the restaurant and informing Deputy Rebholz that he was suing the City of Lake Worth and that he wanted to speak to his supervisor.  Deputy Rebholz then called Sergeant William Meloy. Sergeant Meloy informed the restaurant manager that Mr. Mikhail had a right to speak on the public sidewalk.

Mr. Mikhail claims that he is chilled and deterred from expressing his religious message for fear of arrest.  As such, Mr. Mikhail seeks to enjoin the Defendants from enforcing sections 15-10 and 21-18 of the code of ordinances of the City of Lake Worth against him.  In response, Defendants claim that Mr. Mikhail has no standing to challenge these statutes based on the lack of any enforcement proceedings being initiated against him.  In addition, they contend that Mr. Mikhail cannot succeed on the merits of his First Amendment claims.

―――――

II. Conclusions of Law

A. Standing

Standing is the "threshold issue in every federal case, determining the power of the court to entertain the suit." Warth v. Seldin, 422 U.S. 490, 499 (1975). Standing has three requirements: "(1) an injury in fact, meaning an injury that is concrete and particularized, and actual or imminent, (2) a causal connection between the injury and the causal conduct, and (3) a likelihood that the injury will be redressed by a favorable decision." Granite State Outdoor Adver., Inc. v. City of Clearwater, 351 F.3d 1112, 1116 (11th Cir. 2003). The "overbreadth" doctrine is an exception to this general rule and applies in those circumstances where "laws are written so broadly that they may inhibit the constitutionally protected speech of third parties." Members of City Council of the City of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 798 (1984). Third-party standing is permitted under the overbreadth doctrine "when a statute is constitutionally applied to the litigant but might be unconstitutionally applied to third-parties not before the court." Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 634 (1980) (emphasis omitted). "A plaintiff seeking to make an overbreadth challenge must first show that he has suffered an injury in fact" by demonstrating that "he personally has suffered some actual or threatened injury." Granite State Outdoor Advertising, Inc. v. City of Clearwater, 351 F.3d 1112, 1116 (11th Cir. 2003) (emphasis omitted); see CAMP Legal Defense Fund, Inc. v. City of Atlanta, 451 F.3d 1257, 1269 (11th Cir. 2006).

Defendants dispute Plaintiff's standing to raise a First Amendment challenge to section 21-18 of the code of ordinances of the City of Lake Worth. That ordinance provides as follows:

Sec. 21-18. Permits for special events:

> (a) It shall be unlawful to organize, conduct or participate in any special event on the streets of the city or at any of the city's outdoor recreational facilities unless a permit for such special event has been issued by the city manager or his designee, or by the city commission if the city manager or his designee determines that the proposed event raises an issue of policy that only the city commission can decide. A special event permit shall be issued only after an application therefore has been submitted, on a form provided by the city, no later than sixty (60) days prior to the date on which the special event is proposed to be held.
>
> (b) For purposes of this section, "special event" shall mean any parade, festival, celebration, block party, or other gathering of persons, animals, or vehicles, or any combination thereof, having a common purpose, design, or goal, which substantially inhibits the usual flow of pedestrian or vehicular traffic or which substantially preempts the use of a public area or building by the general public.

(Ord. No. 91-15, § 1, 7-15-91)

The Court agrees with Defendants. Simply put, after carefully considering the evidence and assessing the credibility of the parties, the Court concludes that Defendants did not invoke this ordinance at any time in their dealings with Plaintiff. Furthermore, there is no evidence demonstrating that any of the police officers or city officials were under the impression that this ordinance applies to street preaching. Even more significant is the lack of record evidence that Plaintiff was ever required to obtain a permit prior to preaching. Finally, the clear language of the ordinance makes clear that a "special event" is a "parade, festival, celebration, block party" or any gathering which "substantially inhibits the usual flow of pedestrian or vehicular traffic or which substantially preempts the use of a public area or building by the general public." Nothing about this language encompasses street preaching.

Nonetheless, Defendants point to American-Arab Anti-Discrimination Comm. v. City of Dearborn, 418 F.3d 600 (6th Cir. 2005), claiming that, in Dearborn, a substantially similar permit ordinance was held to be overbroad on a facial challenge. However, the Court need not address

any similarities between the ordinances in Dearborn and the instant case. Unlike the instant case, in Dearborn, the plaintiffs were actually prosecuted for violating the city ordinance. Id. at 603-04. Here, the ordinance was not invoked against Plaintiff. Moreover, there was no evidence suggesting that Defendants intend to apply this ordinance against Plaintiff in the future. In sum, the Court finds that Plaintiff has no standing to challenge section 21-18 and the Court therefore does not need to address any remaining claims pertaining to this ordinance. See Granite State Outdoor Advertising, Inc. v. City of St. Petersburg, 348 F.3d 1278, 1282 (11th Cir. 2003) (courts should not address hypothetical constitutional violations in the abstract).

B.  Likelihood of Success on the Merits

In analyzing Plaintiff's challenge to the breach of peace ordinance,[2] the Court begins by looking to guidance from the United States Supreme Court which has stated as follows:

> The offense known as breach of the peace embraces a great variety of conduct destroying or menacing public order and tranquility. It includes not only violent acts but acts and words likely to produce violence in others. No one would have the hardihood to suggest that the principle of freedom of speech sanctions incitement to riot or that religious liberty connotes the privilege to exhort others to physical attack upon those belonging to another sect. When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the state to prevent or punish is obvious.  Equally obvious is it that a state may not unduly suppress free communication of views, religious or other, under the guise of conserving desirable conditions.

---

[2] Plaintiff seeks to challenge 15-10 of the code of ordinances of the City of Lake Worth. The testimony demonstrates that Officer Raskin did not invoke that ordinance, but Florida Statute § 877.03.  The Court does not find a substantial difference between the two statutes and would give the city ordinance the same narrow interpretation that the Florida Supreme Court has given the state statute.  See State v. Saunders, 339 So. 2d 641 (Fla. 1976) (limiting Florida Statute § 877.03 to words which "by their very utterance  inflict injury or tend to incite an immediate breach of the peace or to words, known to be false, reporting some physical hazard in circumstances where such a report creates a clear and present danger of bodily harm to others.") (internal citations, quotation marks and ellipses omitted).

Cantwell v. Connecticut, 310 U.S. 296, 308 (1940); see also Feiner v. New York, 340 U.S. 315, 320-21 (1951); Carroll v. President & Commr's of Princess Anne, 393 U.S. 175, 180 (1968) (there are "special, limited circumstances in which speech is so interlaced with burgeoning violence that it is not protected by the broad guarantee of the First Amendment.")

While "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content," Police Dep't of City of Chicago v. Mosley, 408 U.S. 92, 95 (1972), its protections are not absolute, but come with some well established limitations. Chaplinsky v. New Hampshire, 315 U.S. 568 (1942). "Fighting words," or words "which by their very utterance inflict injury or tend to incite an immediate breach of the peace," are not protected by the First Amendment. Id. at 571-72. Whether words are "fighting words," depends "upon the circumstances of their utterance." Lewis v. City of New Orleans, 415 U.S. 130, 135 (1974) (Powell, J., concurring in the result). "It is the tendency or likelihood of the words to provoke violent reaction that is the touchstone of the Chaplinsky test, not whether in a given case violence was desired by the speaker or actually occurred." Lamar v. Banks, 684 F.2d 714, 718-19 (11th Cir.1982). The question of whether the tendency of words is to provoke violence is one of fact. Id. at 719-20; see Wilson v. Attaway, 757 F.2d 1227, 1246 (11th Cir.1985).

Here, the facts show that it was Plaintiff's "fighting words," and not his purported religious message, that created a volatile situation necessitating Officer Raskin's intervention. Several women in the crowd that had gathered around Plaintiff ran to find Officer Raskin out of fear that one of their boyfriends was going to "kill" Mr. Mikhail. When Officer Raskin returned to the scene, he did not observe Plaintiff preaching Scripture, but yelling and calling people

7

"sinners,""whores" and "prostitutes."  Significantly, Officer Raskin did not approach Plaintiff until he observed a man get up at the table where Plaintiff was directing his speech.  At that point, Officer Raskin believed that the man was about to attack Plaintiff.  By asking Plaintiff to "stop," Officer Raskin sought to diffuse the explosive scene.  In fact, although Officer Raskin invoked the breach of peace statute, he did not charge Plaintiff with disorderly conduct, thus demonstrating that his goal was not to silence Plaintiff's purported religious message, but to control a disorderly situation.[3]  See Feiner, 340 U.S. at 306 (conviction of disorderly conduct upheld when speaker on public street created a clear and present danger of immediate threat to public order); cf. United States v. Lyons, 403 F.3d 1248, 1254 (11th Cir. 2005) ("it is equally clear that challenged *conduct* that involves something more than "mere speech" remains subject to § 877.03") (emphasis in original) citing C.L.B. v. State, 689 So. 2d 1171, 1172 (Fla. Dist. Ct. App.1997) (holding that defendant's nonverbal acts, which included repeatedly approaching police officer, in combination with his speech, violated § 877.03); W.M. v. State, 491 So. 2d 335, 336 (Fla. Dist. Ct. App.1986) (finding that defendant's conduct during a traffic stop, which drew a large hostile crowd to the scene, constituted disorderly conduct); Delaney v. State, 489 So.2d 891, 892 (Fla. Dist. Ct. App.1986) (upholding probable cause to arrest and conviction under § 877.03 where appellant's conduct consisted of more than his arguably protected speech and such conduct precluded the officer from investigating by being loud and abusive, continually interrupting the officer's investigation, and ignoring the officer's request to wait his turn.) (internal quotation marks, brackets and ellipses omitted).

---

[3] In fact, there is no evidence in the record that the police charged Plaintiff with any crime during either this incident or the later incident.

Based on this record, the Court rejects Plaintiff's argument that the police action improperly applied a "heckler's veto," an impermissible content-based speech restriction. First, the cases relied upon by Plaintiff in support address regulations applied in *anticipation* of a speaker's hostile message and the *potential* reaction of a crowd. See, e.g., Forsyth County v. Nationalist Movement, 505 U.S. 123 (1992) ("speech cannot be . . . punished or banned simply because it *might* offend a hostile mob"); Rosenbaum v. City and County of San Francisco, 484 U.S. 1142 (9th Cir. 2007) ("[a] heckler's veto is an impermissible content-based speech restriction where the speaker is silenced due to an *anticipated* disorderly or violent reaction of the audience.") (emphasis added).[4]  Furthermore, Plaintiff's speech cannot be analogized to those cases where courts have protected speakers delivering messages to highly volatile crowds. Terminiello v. Chicago, 337 U.S. 1, 4 (1949) (overturning disorderly conduct conviction when speaker engaged in "provocative and challenging" speech); Gregory v. City of Chicago, 394 U.S. 111 (1969) (overturning disorderly conduct conviction of civil rights protestors when disorder had come from neighbors who attacked the protestors with rocks and other objects). At the heart of those cases is the fundamental concern that a "heckler's veto rewards the enemies of freedom for their misbehavior" and serves to "deprive us of arguments that lie at the heart of First Amendment protection." David Currie, The Constitution in the Supreme Court: 1946-1953, 37 Emory L. J. 249, 265 (1988).  Instead, Plaintiff's speech was nothing more than "personally

---

[4] Nor can these facts be analogized to Collin v. Chicago Park Dist., 460 F.3d 746 (7th Cir. 1972), another case cited by Plaintiff.  That case analyzed various prior restraints based on the history of violence by the plaintiffs asserting their First Amendment rights.  However, Collin provides ample support for this Court's finding that Plaintiff is unlikely to succeed in demonstrating a First Amendment violation.  Collin stated nothing prevented the prosecution of the plaintiffs "if in the course of his speech they incite or start violence." Id. at 755.

abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." Cohen v. California, 403 U.S. 15, 20 (1971) (discussing the doctrine of "fighting words").

Indeed, the facts demonstrate that when Plaintiff approached Officer Raskin and informed him that he would be preaching, Officer Raskin told him that he had no problem with that activity. In other words, Plaintiff's protected speech, i.e., his religious message, was not at issue. It was only when that message denigrated into "fighting words" that Officer Raskin was forced to intervene. Nor is this a case where the crowd was the aggressor. Plaintiff took on that role. Thus, Plaintiff cannot now wrap himself in the cloak of the First Amendment to add an air of legitimacy to his provocative epithets.

As such, the Court cannot accept Plaintiff's view of the factual record. According to Plaintiff, he used the terms "sinners," "whores" and "prostitutes," generally and in the context of his appeal to his audience to accept his religious message. Instead, the Court credits Officer Raskin's testimony that these terms were directed at individuals and were not placed in a religious context. To the extent that Plaintiff contends that these words can be found in the Bible and therefore is part and parcel of his religious message, the Court rejects this as well. When Officer Raskin arrived back on the scene, Plaintiff was not preaching, but simply yelling "abusive epithets" at the crowd that had gathered.[5] Id.

---

[5] The Court rejects Plaintiff's claim that he was not engaging in direct personal insults intended to provoke a violent reaction. Furthermore, Plaintiff's citations to Officer Raskin's testimony that the crowd never threatened violence is simply wrong. Taken in context, Officer Raskin explained that he believed that Plaintiff was about to get attacked and that he was not under any threat because the boyfriend of one of the girls was getting up but had not yet approached Plaintiff. In addition, Officer Raskin explained that if the crowd was offended *and* Plaintiff's conduct rose to disorderly conduct, Plaintiff could be arrested for breach of peace. Of

Lastly, a party seeking a preliminary injunction must show the following: (1) a substantial likelihood of success on the merits; (2) irreparable injury; (3) that the threatened injury to Plaintiff outweighs the harm an injunction may cause Defendants; and (4) that granting the injunction would not harm the public interest. See International Cosmetics Exchange,Inc v. Gapardis Health & Beauty, Inc., 303 F.3d 1242, 1246 (11th Cir. 2002); All Care Nursing Svc., Inc. v. Bethesda Memorial Hosp., Inc., 887 F.2d 1535, 1537 (11th Cir. 1989).  Given that Plaintiff has not shown a substantial likelihood of success on the merits, the issuance of a preliminary injunction is not warranted.

III.  Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Plaintiff's Motion for Preliminary Injunction (DE 2) is **DENIED**.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida, this 29th day of June, 2009.

                                              KENNETH A. MARRA
                                              United States District Judge

---

course, Plaintiff was not arrested.